# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CONSOLIDATION COAL COMPANY,
                              *Petitioner,*

v.

ARNOLD E. SWIGER; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
                              *Respondents.*

No. 03-1971

On Petition for Review of an Order
of the Benefits Review Board.
(02-618-BLA; 02-618-BLA-A)

Argued: February 25, 2004

Decided: May 11, 2004

Before WILKINS, Chief Judge, MICHAEL, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

Petition denied by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** William Steele Mattingly, JACKSON KELLY, P.L.L.C.,
Morgantown, West Virginia, for Petitioner. Robert F. Cohen, Jr.,
COHEN, ABATE & COHEN, Morgantown, West Virginia, for
Respondent Swiger; Rita A. Roppolo, Office of the Solicitor,
UNITED STATES DEPARTMENT OF LABOR, Washington, D.C.,

for Federal Respondent. **ON BRIEF:** Howard M. Radzely, Acting Solicitor of Labor, Donald S. Shire, Associate Solicitor, Patricia M. Nece, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Consolidation Coal Company petitions for review of a decision by the Benefits Review Board (BRB) affirming an Administrative Law Judge (ALJ)'s award of benefits to Arnold E. Swiger under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* Because each of the several ALJ decisions over the course of this case were supported by substantial evidence and involved no legal errors, we deny the petition for review.

I.

Arnold Swiger, who is seventy-three, worked in coal mine employment for forty years before leaving the industry on January 31, 1992. Most of his employment was spent inside the mines. Swiger smoked approximately one-half pack of cigarettes a day from the early 1950s until 1979, when he developed Legionnaire's disease. Although Swiger no longer smokes cigarettes, he continues to smoke four to five bowls of pipe tobacco a day.

Swiger first applied for federal black lung benefits in the early 1970s. The Social Security Administration (SSA) denied benefits in a letter dated July 25, 1973, and Swiger did not appeal the decision. He filed a second application for benefits on February 1, 1990, which was denied by a district director on June 26, 1990. In 1992 Swiger

filed his third application for benefits and requested an administrative hearing. On July 12, 1993, ALJ Victor Chao determined that although Swiger had established the presence of a totally disabling respiratory impairment, he had failed to establish the presence of pneumoconiosis. Accordingly, the ALJ denied benefits. Swiger alleges that on August 10, 1993, he mailed a letter to the Department of Labor (DOL) stating, "I protest this claim . . . you state I am disabled due to smoking. But you have disregarded 40 1/4 years in the mines." J.A. 40. Approximately two months after sending the letter, Swiger called the DOL to check on the status of his case. After being informed that the DOL had never received his letter of protest, Swiger decided to "give up." J.A. 803.

In 1997 Swiger filed his fourth application for black lung benefits and retained counsel for the first time. As an initial matter, Swiger argued that his 1992 application for benefits was still pending because his letter to the DOL, dated August, 10 1993, constituted a valid appeal of the ALJ's denial of benefits. ALJ Richard Morgan held a formal administrative hearing on the matter and ruled that the letter, although not an appeal, constituted a timely request for modification pursuant to 20 C.F.R. § 725.310. Because the request had never been finally denied, the ALJ merged Swiger's fourth application, dated January 7, 1997, into the still-pending 1992 claim. The ALJ also found that Swiger's file was in total disarray. He therefore remanded the case to the district director's office, asking it to reconstruct the file and to provide each of the parties an opportunity to obtain and submit new medical evidence.

Following the remand, Swiger's counsel sent a cover letter to the district director's office informing it of Swiger's initial application for black lung benefits in the early 1970s. Enclosed with the letter was a copy of the SSA document, dated July 25, 1973, that denied Swiger benefits. After contacting several sources within the SSA, the district director determined that "a claim was filed [in 1973], almost certainly denied, forwarded to the Federal Records Center in 1980, and the file was destroyed in 1985 or 1986." J.A. 808.

Soon thereafter, Consolidation sought to be dismissed from the case as the responsible operator, claiming that Swiger was never sent an election card informing him of his right to appeal his 1973 Part B

claim. *See* 20 C.F.R. §§ 725.496, 410.704. Consolidation and Swiger both took the position that the SSA's failure to provide an election card meant that Swiger's Part B claim, originally denied on July 25, 1973, was still alive, thereby allowing him to elect review of that claim. *See id.* § 410.704. If Swiger could make this election, liability for his case would be transferred from Consolidation to the Black Lung Disability Trust Fund. *See id.* § 725.496. ALJ Michael Lesniak held a hearing to resolve the issue and, on April 16, 2001, denied Consolidation's motion to be dismissed as a responsible operator. ALJ Lesniak concluded that the preponderance of the evidence indicated that Swiger had been sent an election card and failed to return it to the government, thereby waiving his right to review of his Part B claim. *See id.* § 410.704(d).

With the procedural issues resolved, ALJ Lesniak proceeded to hold a hearing on Swiger's eligibility for black lung benefits. In a written opinion dated May 8, 2002, the ALJ first considered the radiological evidence. The parties submitted a total of fifty-two x-ray interpretations, only thirty-nine of which conformed to the classification requirements set forth in 20 C.F.R. § 718.102. Of the thirty-nine qualifying x-rays, nine were read positive for pneumoconiosis and thirty were read negative. The positive interpretations included eight readings made by seven different dual qualified B-readers/radiologists, and twelve of the negative interpretations were made by five different dual qualified B-readers/radiologists. Based on this conflicting evidence, the ALJ concluded that "the radiological evidence neither precludes nor establishes pneumoconiosis." J.A. 877.

The ALJ next considered the conflicting medical reports of twelve physicians, only eight of which are relevant here. Drs. Bellotte, Renn, Fino, Branscomb, and Rosenburg all concluded that Swiger did not have pneumoconiosis. Dr. Bellotte found that Swiger was suffering from a chronic obstructive pulmonary disease (COPD) due to his history of smoking, asthma, and possibly cardiovascular problems. Dr. Renn examined Swiger on three occasions and determined that he was suffering from a totally disabling impairment caused by a combination of tobacco and asthma. Dr. Fino reviewed the medical evidence compiled from 1993-2001 and found that although Swiger was suffering from a respiratory impairment, his condition improved following the use of bronchodilator medication. Because bronchodilators have

no effect on pulmonary impairments caused by coal dust, Dr. Fino reasoned that Swiger must be suffering from the effects of smoking and asthma. Drs. Branscomb and Rosenburger reiterated many of the findings of Drs. Bellotte, Renn, and Fino.

Dr. Rasmussen examined Swiger in 1997 and found that he was suffering from a lung impairment due to the combined effects of asthma, coal mine dust, and smoking. Dr. Rasmussen concluded that "[pneumoconiosis] must be considered a significant contributing factor to his loss of function." J.A. 883. Dr. Abrahams examined Swiger in 1999 and found that although there was no sign of clinical pneumoconiosis, Swiger was suffering from chronic bronchitis caused by cigarette smoking and coal dust exposure, thereby constituting a form of legal pneumoconiosis. *See* 20 C.F.R. § 718.201(a). Finally, Dr. Koenig concluded that Swiger had a fully disabling form of COPD that was caused by the combined effects of smoking and coal mine dust exposure.

The ALJ credited the opinions of Drs. Rasmussen, Abrahams, and Koenig over the five doctors who concluded that Swiger had failed to establish the presence of pneumoconiosis. The ALJ then weighed all of the relevant evidence together and ruled that Swiger had established the presence of pneumoconiosis by a preponderance of the evidence. The ALJ also determined that Swiger had satisfied the other elements necessary to a black lung claim, had established grounds for modification under 20 C.F.R. § 725.310, and was entitled to benefits commencing in April of 1992.

Shortly after the ALJ's decision on eligibility, Swiger filed an application for attorney's fees pursuant to 20 C.F.R. §§ 725.365, 725.366, and 725.367. Consolidation opposed the hourly rate proposed by Swiger's counsel, but the ALJ upheld the requested fee in an order dated November 22, 2002.

Consolidation appealed four issues to the BRB: (1) the ALJ's ruling that Swiger's letter of 1993 constituted a valid request for modification; (2) the ALJ's denial of Consolidation's motion to be dismissed as the responsible operator; (3) the award of black lung benefits; and (4) the award of attorney's fees. On June 13, 2003, the BRB affirmed

on all grounds. Consolidation now petitions this court for a review of the BRB's decision on the same four grounds.

## II.

## A.

We turn first to the question of whether Swiger's letter of August 10, 1993, to the DOL constituted a request for modification of ALJ Chao's denial of benefits. Consolidation argues that: (1) it was irrational to find that the letter was a request for modification because even Swiger argued that the letter was intended to be an appeal; and (2) a letter may only be treated as a request for modification if it is actually received by the government. We disagree on both counts.

During an administrative hearing the ALJ heard testimony from Swiger and Robert Hardesty, District Director of the DOL's Office of Workers' Compensation Programs in West Virginia. Swiger testified that on August 10, 1993, he sent a letter addressed to the Parkersburg, West Virginia, office of the DOL. According to Swiger, the purpose of the letter was to appeal ALJ Chao's denial of benefits, dated July 12, 1993. The text of the letter stated, in part, that "I protest this claim . . . You state that I am disabled due to smoking. But you have disregarded 40 1/4 yr. in the mines." J.A. 40. Swiger further testified that two months after he sent the letter, he called the DOL to inquire about his appeal. Upon being informed that the letter had not been received and that the 30-day appeal period had passed, Swiger "gave up" and filed a new application for benefits in January of 1997. Meanwhile, Director Hardesty testified that he had no record of Swiger's 1993 letter, but Hardesty said he could not exclude the possibility that the letter had arrived and been misplaced or destroyed. Swiger's counsel filed an affidavit setting forth several specific instances in which documents relating to various black lung claims had been lost or otherwise mishandled by the DOL in West Virginia.

The ALJ found that Swiger had sent his letter to the DOL, but that it was not received by the department within the 30-day appeal period. The ALJ also found that the letter did not establish an intent to file a notice of appeal because: (1) the language of the letter, especially the repeated use of the term "you," suggested that Swiger was

addressing the ALJ who issued the order rather than requesting review by the BRB; and (2) the letter was sent to the DOL, whereas the regulations instruct that appeals are to be sent to the BRB. *See* 20 C.F.R. § 802.204. Although the letter was not considered to be an appeal, the ALJ did find that the letter, in conjunction with the telephone call placed to the DOL, was a timely modification request pursuant to 20 C.F.R. § 725.310. Accordingly, the ALJ ruled that Swiger's claim of April 28, 1992, had never been finally denied and therefore merged Swiger's 1997 claim into his 1992 claim.

The procedures governing modification requests under the Black Lung Benefits Act are contained in 20 C.F.R § 725.310, which states:

> Upon his or her own initiative or upon the request of any party on grounds of a change in conditions or because of a mistake in a determination of fact, the district director may, at any time before . . . one year after denial of a claim, reconsider the terms of an award or denial of benefits.

This procedure "permits the correction of mistaken factual findings . . . whether demonstrated by wholly new evidence, cumulative evidence, or merely further reflection on the evidence initially submitted." *Betty B Coal Co. v. Director, O.W.C.P.*, 194 F.3d 491, 497 (4th Cir. 1999). Our circuit has interpreted the modification provisions "expansively, recognizing that black lung proceedings are by nature informal and that the principle of finality just does not apply to . . . black lung claims as it does in ordinary lawsuits." *Consolidation Coal Co. v. Borda*, 171 F.3d 175, 180 (4th Cir. 1999) (citations omitted). Accordingly, a request for modification "need not meet formal criteria," *id.* at 181, and "almost any sort of correspondence from the claimant can constitute a request for modification of a denial, as long as it is timely and expresses dissatisfaction with a purportedly erroneous denial," *Betty B Coal*, 194 F.3d at 497. "In short, the modification procedure is flexible, potent, [and] easily invoked." *Id.*

Consolidation recognizes the liberality of the modification procedures. However, in this case it argues that Swiger's letter could not constitute a request for modification because Swiger took the position that the letter was intended as an appeal. We disagree. The Supreme Court has said that the label attached to a request for modification is

"irrelevant . . . so long as the action in fact comes within the scope of the section." *Banks v. Chicago Grain Trimmers Ass'n, Inc.*, 390 U.S. 459, 465 n.8 (1968). Likewise, our circuit has held that "a claimant does not forfeit the advantages of modification just because . . . his filing is styled as a new claim." *Betty B Coal Co.*, 194 F.3d at 497. These statements indicate that the content of the purported request for modification controls the analysis, rather than the label attributed to it. Because the language of the letter was indicative of a request for modification, the ALJ could rightfully discount Swiger's testimony. To hold otherwise would interfere with the ALJ's role as trier of fact.

Consolidation also argues that "a letter never received and telephone call fail to constitute a valid modification request." Petitioner's Brief at 17. But in this case the ALJ's determination clearly implies that the letter was received by the DOL. The ALJ first found that Swiger mailed the letter. He then credited an affidavit submitted by Swiger's counsel indicating that the West Virginia DOL office had lost similar materials on previous occasions. Finally, the ALJ noted that District Director Hardesty conceded that Swiger's letter may have been lost or destroyed. The clear implication of these findings is that the letter was sent by Swiger, received by the DOL, and subsequently lost by the agency. *See Crace v. Kentland-Elkhorn Coal Corp.*, 109 F.3d 1163, 1166 (6th Cir. 1997) (courts will presume that letter placed in mail "reached [its] destination in the usual time and [was] received by the person to whom [it was] addressed"). In *Consolidation Coal Co. v. Borda*, 171 F.3d 175, our court reviewed a similar case in which a claimant sent a letter to the DOL seeking review of a district director's denial of benefits. When the government informed the claimant that it did not have a copy of the letter in its files, he abandoned his case. Several years later, the claimant filed a new application for benefits. We held that the lost letter was properly construed as a request for modification, stating that "if the absence of the letter from the government's file is attributable to bureaucratic bungling, that cannot strip [petitioner] of his claim. The content and context of the letter itself, and not the Director's reaction to it, must govern whether it was a request for modification." *Id.* at 181. *Borda* makes it clear that where, as here, the letter's absence from the DOL files is a result of "bureaucratic bungling," the ALJ should focus on the "content and context" of the letter to determine whether it was a request for modification. In this case the ALJ did exactly that. There-

fore, we conclude that the ALJ committed no error in construing Swiger's letter as a request for modification. Accordingly, Swiger's 1992 claim remains viable, and the ALJ properly merged his 1997 application for benefits claim into the still-pending 1992 claim. *Id.* at 182.

### B.

The next question we address is whether the ALJ erred in denying Consolidation's motion to be dismissed as the responsible operator in this case. Consolidation argues that Swiger's 1973 application for benefits is still open because the government never sent him an election card as required by federal law. This would have the effect of transferring liability for Swiger's case to the Black Lung Disability Trust Fund. Because we conclude that the ALJ's decision was supported by substantial evidence, we reject Consolidation's argument.

When Swiger first applied for benefits sometime in the early 1970s, his claim was governed by Part B of Title IV of the Federal Coal Mine Health and Safety Act of 1969, which was titled the Black Lung Benefits Act (BLBA). Part B was a federally funded program originally administered by the Social Security Administration. *Crace*, 109 F.3d at 1165. In 1977 and 1981 Congress passed a series of amendments to the BLBA that made it easier for claimants to qualify for black lung benefits by liberalizing the entitlement criteria. *Id.* at 1165-66. The amendments also permitted all claimants who had been denied benefits prior to March 1, 1978, to have their cases reopened and reviewed under the new, more lenient eligibility standards. *Id.* Finally, the amendments established the Black Lung Disability Trust Fund to pay for any costs associated with these reopened cases, thereby relieving coal mine operators from unanticipated liability.

The regulations implementing the 1977 and 1981 amendments required the government to notify all eligible Part B claimants of their rights. *See* 20 C.F.R. § 410.704(a). Eligible parties were to be sent a letter of notice explaining the changes in the law, accompanied by an election card that a claimant had to fill out if he wanted his case reopened under the new provisions. If the election card was not returned to the government within six months, the claimant waived

the right to have his case reopened unless he established good cause for the untimely response. *Id.* at § 410.704(d).

In this case Consolidation concedes that Swiger never returned an election card, but it argues that his failure to respond was justified because the government never sent him a card. During an administrative hearing, Swiger testified that he had no recollection of receiving an election card and further asserted that he would have a copy of the card if it had been sent because he "kept everything" related to his black lung claims. In response, the DOL introduced an SSA computer printout showing that the government had sent Swiger an election card and that no response was ever received. The ALJ ruled that in light of the printout, it was more likely than not that an election card was sent to Mr. Swiger, noting that "the fact that [the Swigers] do not recall a particular piece of mail 22-1/2 years after the fact does not establish that it was not received." J.A. 813. The ALJ also found that Swiger's statements were somewhat inconsistent. Specifically, Swiger claimed that he kept all documents related to his black lung cases, but the only document he had relating to his 1973 benefits application was a single letter denying his claim. The ALJ reasoned that there must have been more documents related to that case, thereby suggesting that Swiger had, on previous occasions, discarded outdated documents related to his black lung claims.

Consolidation argues that the ALJ's findings on the election card issue are not supported by substantial evidence. We disagree. The Sixth Circuit has held that when the government introduces computer data indicating that an election card was sent, it is entitled to a presumption that the card "reached [its] destination in the usual time and [was] received by the person to whom [it was] addressed." *Crace*, 109 F.3d at 1166 (citing *Hagner v. United States*, 285 U.S. 427, 430 (1932)). Consolidation recognizes this presumption, but argues that we should not apply it in this case because the government's printout shows that the election card allegedly sent to Swiger may have been addressed to "Mr. Swinger." However, the ALJ specifically addressed this possibility and found that the misspelling "would not have precluded the card receipt in the normal and ordinary course." J.A. 813. There is evidence in the record showing that Swiger had received mail sent by the SSA while living at the same address, despite similar misspellings of his last name. We believe the SSA printout, accompa-

nied by Swiger's inconsistent testimony, constitutes substantial evidence supporting the ALJ's determination that Swiger never elected review of his Part B claim, thereby making Consolidation the appropriate party in this case.

C.

Consolidation also appeals the ALJ's decision to award benefits. The company alleges four separate errors: (1) the ALJ failed to determine that there was a material change in Swiger's condition between his 1992 application for benefits and his 1997 application; (2) the ALJ provided an insufficient explanation for crediting certain medical opinions while discounting others; (3) the ALJ failed to determine whether Swiger was suffering from asthma; and (4) there was insufficient evidence in the record to prove that Swiger's disability was caused by coal mine dust.

1.

Consolidation first argues that the ALJ failed to determine that Swiger has shown a material change in condition between his 1992 application for benefits and his 1997 application for benefits. *See, e.g.*, *Lisa Lee Mines v. Director, O.W.C.P.*, 86 F.3d 1358 (4th Cir. 1996). In section II.A we upheld the ALJ's determination that Swiger's 1992 claim remains open because of his request for modification. As we said, the legal effect of that determination is that Swiger's 1997 claim has been merged into the 1992 claim. Therefore, the ALJ was not required to find any material change in Swiger's condition before considering his 1997 claim. Swiger only had to demonstrate a material change in his condition between his *1990* application for benefits and his 1992 application. The ALJ specifically found a material change in condition over that time period, and the evidence supports that finding. Accordingly, we find no error in the ALJ's treatment of the issues relating to the material change in condition.

2.

Consolidation next argues that the ALJ did not adequately explain why he favored the reasoning contained in the medical opinions of

Drs. Rasmussen, Abrahams, and Koenig, while discounting the opinions of Drs. Bellotte, Branscomb, Renn, Fino, and Rosenberg. Although an ALJ must "explain why he credited certain evidence and discredited other evidence," *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 533 (4th Cir. 1998), our court has repeatedly recognized that "the duty of explanation is not intended to be a mandate for administrative verbosity or pedantry. If a reviewing court can discern what the ALJ did and why he did it, the duty of explanation is satisfied." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1999) (*citing Lane Hollow Coal Co. v. Director, O.W.C.P*, 137 F.3d 799, 803 (4th Cir. 1998)).

In this case the ALJ included a lengthy statement explaining why he credited the reports of Drs. Rasmussen, Abrahams, and Koenig over those of Drs. Bellotte, Branscomb, Renn, Fino and Rosenberg. Specifically, the ALJ stated that:

> [1] [T]he opinions of Drs. Rasmussen, Abrahams, and Koenig are more consistent with the miner's complaints of worsening breathing problems; the miner's 40 year coal mine employment history ending in 1992; Claimant's cigarette smoking history which ended in 1979; his ongoing pipe smoking history; and, the abnormal recent clinical test results. [2] Several of the physicians cited by Employer relied, at least in part, upon "negative" x-ray evidence. However . . . the foregoing [x-ray] evidence was inconclusive. [3] It certainly did not rule out "Legal Pneumoconiosis." [4] Furthermore, those same physicians cited the partial reversibility shown on pulmonary function testing as inconsistent with pneumoconiosis because that disease is progressive. Although the partial reversibility may be more consistent with findings of asthma or smoking-induced lung disease than pneumoconiosis, the recent pulmonary function studies, including those performed post-bronchodilator, still revealed significant abnormalities which are consistent with the opinions of Drs. Rasmussen, Abrahams, and Koenig that the miner's totally disabling respiratory or pulmonary impairment is due to a combination of factors, including pneumoconiosis.

J.A. 888-89. Consolidation argues that the ALJ's first reason for crediting the opinions of Drs. Rasmussen, Abrahams, and Koenig was insufficient because all of the medical experts explained how their respective diagnoses were consistent with Swiger's symptoms. *See* Petitioner's Brief at 25. Regardless of whether Consolidation's argument is correct, it fails to address the several additional reasons underlying the ALJ's decision. Specifically, the ALJ's comments make it clear that he also discounted the opinions of Drs. Bellotte, Branscomb, Renn, Fino, and Rosenberg because they: (1) relied on negative x-ray evidence, while the ALJ found the totality of the x-ray evidence to be inconclusive; (2) focused on "clinical" rather than "legal" pneumoconiosis; and (3) did not adequately explain why Swiger continued to show a significant pulmonary impairment after a bronchodilator had been administered. Because we believe there is substantial evidence in the record supporting each of these reasons and because "it is the province of the ALJ to evaluate the physicians' opinions," *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 211 (4th Cir. 2000), we find no error in the ALJ's explanations.

The opinions of Drs. Bellotte, Branscomb, Renn, Fino, and Rosenburger all make specific references to the fact that Swiger's chest x-rays were negative and use this as a reason weighing against the existence of pneumoconiosis. Because the ALJ determined that the x-ray evidence was inconclusive rather than negative, he could rightfully discount the medical opinions that contradicted his findings. *See, e.g.*, *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 441 (4th Cir. 1997) (stating that it was error when "the ALJ ignored evidence that one of the physicians who diagnosed [the claimant] with pneumoconiosis . . . reached his conclusion on the basis of a discredited x-ray examination").

The record also contains evidence that each of these five physicians focused on "clinical" (or "medical") pneumoconiosis rather than "legal" pneumoconiosis. "Clinical" pneumoconiosis refers to "the lung disease caused by fibrotic reaction of the lung tissue to inhaled dust, which is generally visible on chest x-ray films as opacities." *Hobbs v. Clinchfield Coal Co.*, 917 F.2d 790, 791 fn.1 (4th Cir. 1990). However the BLBA also covers "legal pneumoconiosis," which is defined as any "chronic, restrictive, *or obstructive respiratory* and pulmonary impairments arising out of coal mine employ-

ment." *Freeman United Coal Mining Co. v. Summers*, 272 F.3d 473, 481 (7th Cir. 2001) (emphasis added). *See also* 20 C.F.R. § 718.201(a)(2). Four out of the five physicians whom the ALJ discredited concluded that Swiger did not have pneumoconiosis because his impairment was obstructive in nature, despite the fact that legal pneumoconiosis may consist of an obstructive impairment. For example: Dr. Renn says that coal dust exposure would not cause an "obstructive ventilatory defect," J.A. 676, 679; Dr. Rosenburger says that "clinically significant obstructive lung disease . . . is not associated with coal mine dust exposure," J.A. 254-55; Dr. Fino says that Swiger's symptoms demonstrate "obstructive lung disease . . . [which] is not a pattern consistent with the contraction of lung tissue due to fibrosis as would be expected in simple coal workers pneumoconiosis," J.A. 645-46; Dr. Bellotte says that he associates restrictive pulmonary impairments with pneumoconiosis and obstructive impairments with smoking. Meanwhile, Dr. Branscomb admitted that in the last ten years he has not diagnosed a single patient as having pneumoconiosis unless there was positive x-ray evidence. These comments support the ALJ's findings that the employer's physicians were overwhelmingly focused on clinical rather than legal pneumoconiosis.

Finally, we also agree with the BRB that the "administrative law judge's finding[ ] that the opinions of Drs. Rasmussen, Koenig, and Abrahams were more persuasive because they were supported by the presence of a non-reversible impairment . . . constitute[s] [a] valid reason for crediting their opinions over those of employer's experts." J.A. 899. The evidence shows that when Swiger was given bronchodilator medication, his pulmonary condition improved, but the residual impairment that remained was still disabling. All the experts agree that pneumoconiosis is a fixed condition and therefore any lung impairment caused by coal dust would not be susceptible to bronchodilator therapy. In this case, although Swiger's condition improved when given a bronchodilator, the fact that he experienced a disabling residual impairment suggested that a combination of factors was causing his pulmonary condition. As a trier of fact, the ALJ "must evaluate the evidence, weigh it, and draw his own conclusions." *Underwood v. Elkay Mining, Inc.*, 105 F.3d 946, 949 (4th Cir. 1997). Therefore, the ALJ could rightfully conclude that the presence of the residual fully disabling impairment suggested that coal mine dust was

a contributing cause of Swiger's condition. *See Freeman*, 272 F.3d at 482-83.

In sum, we conclude that the ALJ's several explanations for crediting the opinions of Drs. Rasmussen, Abrahams, and Koenig were satisfactory and supported by substantial evidence.

3.

Consolidation next argues that the ALJ erred by failing to decide whether the evidence showed that Swiger had non-occupational asthma. In order "to be entitled to benefits, a claimant must prove by a preponderance of the evidence that his pneumoconiosis was at least a contributing cause of his totally disabling respiratory impairment." *Robinson v. Pickens Mather & Co.*, 914 F.2d 35, 38 (4th Cir. 1990). Therefore, once the ALJ determined that coal mine dust exposure was a contributing cause of Swiger's condition, it was irrelevant whether asthma was also present.

4.

Finally, Consolidation argues that there was insufficient evidence to conclude that Swiger's disabling pulmonary impairment was caused by coal dust exposure. Drs. Rasmussen, Abrahams, and Koenig each said that coal mine dust exposure was a contributing factor to Swiger's total disability. However, each of these physicians also found that Swiger's disability was caused in part by smoking and conceded that it was difficult to differentiate between the effects caused by smoking and the effects caused by coal mine dust. Consolidation argues that because these physicians could not apportion the relative effects of tobacco use and coal mine dust exposure, their opinions could not be used to support a finding that Swiger's condition was caused by coal mine dust. We disagree.

Although these physicians "could not determine with any precision what percentage of [Swiger's] impairment was caused by asthma, cigarette smoking, or coal mine dust . . . doctors need not make such particularized findings. The ALJ needs only to be persuaded, on the basis of all available evidence, that pneumoconiosis is a contributing cause

of the miner's disability." *Freeman*, 272 F.3d at 483. In this case Drs. Rasmussen, Koenig, and Abrahams unequivocally concluded that coal mine dust exposure was a contributing factor to Swiger's total disability. That was enough evidence to support the ALJ's decision. At least two other circuits have reached the same conclusion on this exact issue. *See id.*; *Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 576 (6th Cir. 2000).

## D.

Consolidation next argues that the hourly rate the ALJ awarded to Swiger's counsel under the BLBA fee-shifting provisions was unreasonably high. An ALJ's "award of attorney's fees is discretionary, and will be upheld on appeal unless arbitrary, capricious, an abuse of discretion, or contrary to law." *Kerns v. Consolidation Coal Co.*, 176 F.3d 802, 804 (4th Cir. 1999). Because the ALJ relied on proper criteria in awarding attorney's fees, we affirm the ALJ's judgement.

Swiger's counsel, Robert F. Cohen, Jr., applied for attorney's fees pursuant to 20 C.F.R. § 725.366 and requested a rate of $225.00 an hour. Consolidation objected to this figure, noting that Cohen's firm charged a maximum of $175.00 an hour in most civil litigation matters. In response, Cohen argued that the rate was justified because of his expertise in the black lung field and because other ALJ's have awarded him a similar rate in the past. The ALJ ruled that $225.00 was reasonable, stating that:

> Mr. Cohen is winning far more cases than many other [black lung] attorneys. These black lung cases are very hard to win. Mr. Cohen is probably, in my experience, and I have seen him for many years, the strongest Claimant's lawyer in the field . . . he is more or less setting the standard. So I'm going to go along with the other judges in this office and award the $225 rate . . . I'm relying on my personal experience with Mr. Cohen, seeing him in part, and seeing his professionalism, reading his briefs, and comparing him with other attorneys that come before me, and also what he has been awarded as attorney's fees in the past.

S.J.A. 77-78.

Consolidation argues that "these reasons are inadequate as a matter of law to justify approval of the hourly rate requested." Petitioner's Brief at 47. The black lung regulations state that "any fee [approved by the court] . . . shall take into account the quality of the representation, the qualifications of the representative, the complexity of the legal issues involved . . . and any other information which may be relevant to the amount of fee requested." 20 C.F.R. § 725.366(b). The ALJ's comments clearly indicate that the award was based, in part, on both the quality of Cohen's representation and his previous experience in black lung cases. Under the controlling regulations, there was nothing unreasonable about awarding a higher hourly rate based on these factors. *See id.*; *see also Zeigler Coal Co. v. Director, O.W.C.P.*, 326 F.3d 894, 902 n.9 (7th Cir. 2003) (upholding ALJ's awarded hourly rate where "counsel indicated that he charged this higher rate because of his experience with black lung cases"). Furthermore, Cohen has been awarded similar fees in comparable cases. *See Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987). Therefore, the ALJ's award of attorney's fees was not an abuse of discretion.

### III.

We agree with the Benefits Review Board that the ALJs in this case made no errors of law, that their findings of fact are supported by substantial evidence in the record as a whole, and that Arnold Swiger qualifies for black lung benefits. Accordingly, we deny Consolidation Coal Company's petition for review.

*PETITION DENIED*